UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| National Child Support, Inc., | : | Case No. 1:02-cv-928 |
| | : | Judge Sandra S. Beckwith |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Thomas Hayes, Director, Ohio Department of Job and Family Services, et al, | : | |
| | : | |
| Defendants. | : | |

**ORDER**

Before the Court is the Defendants' Motion to Dismiss (Doc. 24) the Plaintiff's Second Amended Complaint.  Plaintiff has opposed the motion (Doc. 27), and Defendants have filed a reply (Doc. 28).

Background

Plaintiff National Child Support, Inc. ("NCS") is a private company that contracts with both individuals and government entities for collection of child support payments.  (Compl. ¶3)[1] Defendant the Ohio Department of Job and Family Services ("ODJFS") is the Ohio state agency responsible for child support enforcement services under Title IV-D of the federal Social Security Act, 42 U.S.C. §651 et. seq.  Title IV-D generally provides federal funds to states to assist and encourage state efforts to collect unpaid child support.  Federal statutes and

---

[1] All references to "Compl." are to Plaintiff's Second Amended Complaint, Doc. 23.

regulations describe the available federal matching funds and the purposes for which such funds may be used by the participating states. 45 C.F.R. §301.1 sets the matching funds rate as 66% of state costs.

Defendant Thomas Hayes is the Director of ODJFS.[2] Defendant Joe Pilat is the Deputy Director of the ODJFS Office of Child Support, and is allegedly responsible for distribution of federal Title IV-D funds in Ohio. Defendant Barbara Stafford is the Director of the Bureau of Policy in the ODJFS Office of Child Support, and allegedly develops policies affecting Title IV-D program administration throughout Ohio. Hayes, Pilat and Stafford are sued in both their official and individual capacities.

NCS alleges that it had child support collection contracts with the Butler County, Ohio Child Support Enforcement Agency ("CSEA") from 1998 to 2001, contracts that ODJFS approved. (Compl. ¶16) NCS provided its collection services at reduced rates in recognition of the volume of cases covered by its county contracts. (Compl. ¶19) NCS labels this provision a "volume discount." In August 2001, NCS and Butler County prepared a renewal of the NCS contract for 2002. At the same time, NCS drafted a new contract with Montgomery County, modeled on its Butler County contracts. Both proposals were sent to ODJFS for approval. (Compl. ¶¶17, 18)

---

[2] Barbara Riley became ODFJS Director effective December 20, 2004, and is substituted for Hayes under Fed. R. Civ. P. 25(d).

On December 4, 2001, Defendant Pilat sent a written memo to all Ohio county CSEAs, stating that ODJFS would no longer approve the use of "volume discounts" for child support collection contracts. As a result, ODJFS did not approve the 2002 NCS contracts with Butler and Montgomery counties. (Compl. ¶21)

Defendants object to the term "volume discount." Defendants contend that the practical effect of the contract provision in question is that the contracting county need not pay its "Local Share," defined as that portion of the county's child support expenses not covered by state or federal funds.[3]

The Ohio Administrative Code defines the permissible sources of the local, or "nonfederal," share of enforcement expenses. The 1992 version of OAC §5101:1-31-71 (a predecessor to §5101:1-31-70B cited by Defendants), states that the county CSEA must provide the nonfederal share. Section 5101:1-31-71 incorporates 45 C.F.R. §304.30 to define the permissible sources of those nonfederal share funds, stating in pertinent part:

"(1) Public funds, other than those derived from private resources, used by the CSEA for its IV-D child support enforcement program may be considered as the nonfederal share in claiming federal reimbursement under the following conditions:

(a) The funds are appropriated directly to the CSEA; or

(b) The funds are of another public agency and are treated as follows: . . .

(2) Public funds used by the CSEA for its IV-D child support enforcement program may not be considered as the nonfederal share

---

[3] Since none of the contracts at issue, nor the December, 2001 Pilat memo, have been submitted by any of the parties, the Court will use Plaintiff's phrase for purposes of this Order.

in claiming federal reimbursement under the following conditions:

    (a) The funds are federal funds, unless authorized by federal law to be used to match other federal funds; or

    (b) The funds are used to match other federal funds."

This language has been a part of the OAC for many years.

A different OAC section addresses the requirements for Title IV-D service agreements. That section, OAC 5101:1-29-50, was amended during the pendency of this lawsuit. Effective January 1, 2004, Section 5101:1-29-50(C)(5)(b)(i) explicitly states that the local share of IV-D expenditures under county contracts may not be derived from "Private funds from any source." NCS alleges that this amendment was not required by any change in federal law, and is simply an after-the-fact attempt to justify ODJFS' refusal to approve the NCS contracts.

NCS also alleges that despite the Pilat memo and ODJFS' position on "volume discounts" in NCS contracts, ODJFS approved "volume discounts" in contracts between counties and governmental child support administrative entities (such as prosecuting attorneys or magistrates). In this manner, NCS alleges, ODJFS permitted federal Title IV-D funds to be used to satisfy the local share of these services. (Compl. ¶22) NCS also alleges that ODJFS entered into three contracts with unnamed private vendors for the years 2001 - 2003, contracts permitting ODJFS the "option" of using federal funds for state financial obligations – the same "option" that ODJFS allegedly denied the county CSEAs. (Compl. ¶26) NCS also alleges that ODJFS promulgated new rules and policies after this lawsuit was filed, to justify its

4

prohibition on "volume discounts" in private contracts. (Compl. ¶23) These new rules include the January 2004 amendments to OAC §5101:1-29-50 cited above.

NCS claims it lost at least $1.4 million in yearly revenue when its contracts were not approved, and that custodial parents and their children (on whose behalf NCS pursued support claims) have been deprived of $21 million in support payments "with no assurance that ODJFS will diligently pursue and collect it on their behalf." (Compl. ¶¶33-34) NCS alleges that the Defendants' actions violate federal law and jeopardize Ohio's continued receipt of federal funds.

The Second Amended Complaint includes federal causes of action for due process violations under 42 U.S.C. §1983; claims under 42 U.S.C. §654 and §655 (Title IV-D); and under 15 U.S.C. ¶¶1 and 2. Plaintiff's state law claims are for breach of contract, inducement of contract breach, tortious interference with contract, and violation of R.C. 125.071, an Ohio statute permitting use of "requests for proposals" for certain public contracts.

The Defendants collectively bring a multi-pronged motion to dismiss the Second Amended Complaint. Each of their arguments is addressed below.

**Standard of Review**

The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are

5

taken as true.  See Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993)(citing Nishiyama v. Dickson County, 814 F.2d 277, 279 (6th Cir. 1987)).  To that end, for purposes of a motion to dismiss under the Rule, the complaint must be construed in the light most favorable to the nonmoving party and its allegations taken as true.  See Scheuer v. Rhodes, 416 U.S. 232 (1974); Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995).  To survive a motion to dismiss under Rule 12(b)(6), "a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory."  Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)(citations and internal quotation marks omitted).

    The test for dismissal under Rule 12(b)(6), however, is a stringent one.  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Hartford Fire Insurance Co. v. California, 509 U.S. 764, 811 (1993)(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  See also Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1189 (6th Cir. 1996).  Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless no law supports the claim made, the facts alleged are insufficient to state a claim, or an insurmountable bar appears on the face of the complaint.

**ANALYSIS**

6

1.   <u>NCS' Standing to Sue on Behalf of Its Former Clients</u>.

Defendants argue that NCS lacks standing to prosecute any claims on behalf of the "custodial parents and children" for whom it collected child support payments pursuant to its government contracts. These claims, as stated in the Second Amended Complaint, are for injunctive relief and $21 million of "uncollected child support." NCS argues it has "associational standing" to prosecute these claims on behalf of its former clients.

"An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Hunt v. Washington State Apple Advertising Comm.</u>, 432 U.S. 333, 344 (1977).

NCS argues that there is a "federally enforceable right to collect child support" under Title IV-D which NCS may enforce on behalf of custodial parents. NCS relies on <u>Carelli v. Howser</u>, 923 F.2d 1208 (6th Cir. 1991) in support of this alleged "right." But in <u>Carelli</u>, the Court simply acknowledged that custodial parents were "intended beneficiaries" of Title IV-D. <u>Carelli</u> actually held that the custodial parent plaintiffs could not bring a claim against the Ohio program officials, finding that Title IV-D's elaborate administrative oversight provisions supplanted such a claim. Nothing in <u>Carelli</u> suggests the

7

existence of an open-ended, undefined "right" to "collect child support."

Furthermore, <u>Blessing v. Firestone</u>, 520 U.S. 329 (1997), decided after <u>Carelli</u>, held that, while there **may** be a private right of action under Title IV-D, a plaintiff must identify the specific statutory right she claims to have been violated. That is because a court cannot determine whether Title IV-D, as an undifferentiated and complex whole, gives rise to undefined rights. "Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights." <u>Id.</u> at 342.

NCS also ignores <u>Clark v. Portage County</u>, 281 F.3d 602 (6th Cir. 2002), which followed <u>Blessing</u> and held that even if a custodial parent is an "intended beneficiary" of Title IV-D, she did not have a right to sue to "require" the state to collect her child support: "It is easy to see why that is the case. Under Plaintiff's theory, the state agency would be hauled into federal court each time one of the millions of child support claimants is dissatisfied because the state has not collected child support payments." <u>Id.</u> at 605.

Even if NCS' former clients are "intended beneficiaries" of Title IV-D, NCS' allegations do not meet the <u>Hunt</u> test for associational standing. If NCS is suing on behalf of its former clients because ODJFS has not provided "enough" enforcement services, or because the Ohio state plan fails to meet

8

unspecified federal requirements, that claim would fail in light of <u>Blessing</u> even if it were brought by the custodial parents directly. If NCS is suing on behalf of its former clients because they have not received child support payments they formerly received as a result of NCS' efforts, that claim fails the third prong of the <u>Hunt</u> test: individual custodial parents must participate and prosecute that claim. NCS admits that both Butler and Montgomery counties provide child support enforcement services, and NCS does not allege that **all** or even substantially all of its former clients are without **any** kind of representation.

Therefore, the claims for injunctive relief and damages brought on behalf of NCS' former clients (custodial parents and their children) are dismissed without prejudice, because NCS lacks standing to prosecute those claims.

2. <u>§1983 Claim and Qualified Immunity</u>.

Defendants Hayes (now Riley), Pilat and Stafford seek dismissal of all claims against them based on their official immunity from this suit. To decide whether a government official is immune, the Court must first determine if Plaintiff's constitutional or statutory right has been violated. If a violation is established, the Court must then determine whether the right was "clearly established" at the time of the violation. See, <u>Flint v. Ky. Dept. Of Corrections</u>, 270 F.3d 340, 346-347 (6th Cir. 2001).

In its second cause of action, NCS alleges that defendants violated its "rights" under 45 U.S.C. §654 and/or §655. But NCS

9

does not cite any specific section of either federal statute that any of the defendants violated with respect to NCS. Both statutes are lengthy. Section 654 concerns state plan requirements in a myriad of details; section 655 addresses payments to states, and requirements for federal review and approval of state plans. As noted above, a plaintiff alleging a violation of these statutes must point to **specific** statutory language that has been violated and that gives plaintiff a private right of action. NCS does neither. Its cause of action for violation of 42 U.S.C. §654 and/or §655 is therefore dismissed with prejudice.

NCS' constitutional claim under the 14th Amendment is premised on the alleged violation of its due process rights. To state a valid claim under 42 U.S.C. §1983, a plaintiff must show that the defendant acted under color of state law to deprive the plaintiff of a definite, constitutionally-protected property interest. "Property interests are created and defined by an independent source such as state law. ... A cognizable property interest arises when plaintiffs have a legitimate claim of entitlement (or more than a unilateral expectation) to a particular benefit." Paytel v. City of Detroit, 287 F.3d 527, (6th Cir. 2002) (internal quotations and citations omitted). State-created contract rights are not protected under substantive due process. Bowers v. City of Flint, 325 F.3d 758, 763-64 (6th Cir. 2003); Charles v. Baesler, 910 F.2d 1349, 1354 (6th Cir. 1990). Plaintiff's constitutional claim is thus analyzed only

under the procedural due process rubric.

The Sixth Circuit has recognized a protected property interest in a public contract award if the disappointed bidder can demonstrate (1) that the bidder was awarded the contract and then deprived of it, or (2) that state law granted the governmental entity limited discretion in awarding the contract, which the entity abused. See <u>United of Omaha Life Insurance Co. v. Solomon</u>, 960 F.2d 31, 34 (6th Cir. 1992). Abuse of discretion in this context implies an unreasonable, arbitrary or unconscionable attitude; arbitrary means without adequate determining principle. See <u>Enertech Electrical, Inc. v. Mahoning County Comm'rs</u>, 85 F.3d 257, 260 (6th Cir. 1996). The Court finds these principles helpful to analyzing NCS' allegation of a protected property interest in its contract renewal.

NCS alleges that for "approximately five years" NCS had ODJFS-approved contracts (Compl. ¶8), and that from 1998 to 2001 it had specific contracts with Butler County. NCS alleges that, based upon this history, it had an expectation of continuing those contracts "for at least three years." (Compl. ¶20) NCS fails to cite any state law or rule that supports its legitimate expectation of a renewed contract. For many years OAC §5101:1-29-50 has stated that Title IV-D contracts are written for a maximum of twelve months. However, that Code section also permits counties to request proposals from vendors for "up to a maximum of three years." An accepted three-year proposal requires sequential twelve-month contracts and must meet certain

specified criteria.  NCS does not specifically allege that it had such a three-year proposal actually accepted at any time with any Ohio county.  For purposes of a Rule 12 motion to dismiss, however, the Court must construe NCS' allegations in the light most favorable to NCS.  The Court concludes that the Second Amended Complaint can reasonably be read to include the allegation that NCS did have a three-year proposal accepted some time prior to 2001, which is a colorable basis for an expectancy interest in renewal of its contract.  This satisfies the first prong of United of Omaha, supra, for purposes of Rule 12.[4]

NCS' allegations can also be analyzed under the second prong of United of Omaha, that ODJFS abused its discretion when it "changed the rules" concerning use of "volume discounts" and refused to renew NCS' contracts.  See, e.g., Compl. ¶23, where NCS alleges that no change in law precipitated ODJFS' decision.  The parties have not cited, and the Court is unable to find, any statute or administrative rule giving ODJFS unfettered discretion to approve or disapprove county Title IV-D contracts.  Rather, ODJFS' role seems to be to assure qualification for federal funding.  See, e.g., OAC §5101:1-29-50(G), eff. 7/1/02 [ODFJS is responsible for reviewing CSEA-provider contracts and "rejecting for correction or approving such contracts for federal financial participation (FFP).  Approval for FFP is based upon the

---

[4] If it is established that NCS only had one-year contracts with any county at any time, it may be that NCS has no justifiable expectation of contract renewal, and thus no constitutionally protected property interest.

conformity of such agreements with [the applicable Code of Federal Regulations]."] Defendants seem to agree with this observation. Their motion states that the 2001 Pilat memo, and the 2004 amendments to OAC §5101.1-29-50 which NCS challenges, were intended to conform Ohio law to 45 C.F.R. §304.30.

45 C.F.R. §304.30 was promulgated in 1975, and is titled "Public Sources of State's Share." It does not appear to have been substantively amended since 1975, as far as the Court's research can discern. The parties do not meaningfully discuss the meaning of this regulation nor its relevance to this dispute. And as noted above, the text of 45 C.F.R. §304.30 has long been incorporated into OAC §5101:1-31-70. Defendants' motion does not adequately explain why the 2001 Pilat memo, and the challenged OAC amendments, were required to conform Ohio law to 45 C.F.R. §304.30 when that section is in fact a part of the OAC.

Given these facts, the Court is unable to conclude, on the record presented and as a matter of law, that NCS has failed to state a claim upon which relief may be granted under Rule 12. If federal Title IV-D regulations prohibit the use of "volume discounts," or the use of private funds to satisfy a county's "Local Share," this fact is not clear from the parties' briefs.

As discussed above, the Court cannot determine on the record presented whether or not NCS has a constitutionally protected property interest in its contract renewal. The Court must therefore deny Defendants' motion to dismiss NCS' claim under 42 U.S.C. §1983, and the motion based on qualified

immunity, without prejudice to a subsequent motion addressed to the issues discussed above.

    3.    <u>Eleventh Amendment Bar</u>.

Defendants argue that the Eleventh Amendment bars Plaintiff's claims against the individual defendants and against ODJFS, an agency of the state. All of NCS' claims against ODJFS are clearly proscribed by the Eleventh Amendment and are dismissed with prejudice.

The Eleventh Amendment does not bar a suit against the commissioners of a state regulatory body under the doctrine of <u>Ex Parte Young,</u> 209 U.S. 123 (1908), if the suit is brought against the individual commissioners in their official capacities and the remedy sought is prospective declaratory and/or injunctive relief. See, <u>Verizon North Inc. v. Strand</u>, 367 F.3d 577, 581 (6th Cir. 2004), and <u>Dubuc v. Mich. Bd. Of Bar Examiners</u>, 342 F.3d 610, 615-617 (6th Cir. 2003). To the extent NCS seeks a declaration that ODJFS decision about "volume discounts" and the recent regulatory amendments are invalid, its claims against the individual defendants in their **official** capacities are not barred by the Eleventh Amendment.

NCS argues that its §1983 and its state law contract claims can proceed against the individual defendants, because they are each sued individually for damages. Unless the individual defendants are entitled to qualified immunity, a question the Court cannot determine at this juncture, NCS is correct. The motion to dismiss these claims is therefore denied, without

prejudice to a renewed motion.

    4.   <u>Violation of R.C. 125.071</u>.

Although the state contract claims survive the Defendants' Eleventh Amendment challenge, Plaintiff's claim that the defendants violated Ohio Revised Code 125.071 must be dismissed.

R.C. 125.071, entitled "Purchases by competitive sealed proposal," permits Ohio's director of administrative services to make purchases by competitive sealed proposals "whenever the director determines that the use of competitive sealed bidding is not possible or not advantageous to the state." The statute contains both mandatory and discretionary guidelines for this process, and states that awards may be made pursuant to a competitive proposal that is "most advantageous" to the state. NCS does not allege that it submitted a competitive sealed proposal, or in what manner the statute in question was violated. NCS alleges only that ODJFS extended unidentified contracts without "competitive bidding" and that NCS was harmed as a result. (Compl. ¶30-31)

The Ohio Supreme Court held that a contractor's association lacks standing to prosecute a similar claim under Ohio's competitive bid statute when no association member had actually submitted a bid. <u>Ohio Contractors Assn. v. Bicking</u>, 71 Ohio St.3d 318, 320-321 (1994). The same result applies here. NCS has not alleged that it actually submitted a proposal pursuant to the statute. NCS' conclusory allegation that "other contracts" were awarded that may have violated state law in an undefined

15

manner is insufficient to state a claim for relief. Therefore, NCS' Seventh Cause of Action is dismissed with prejudice.

    5.   <u>Antitrust Claim</u>.

    Defendants move to dismiss NCS' Third Cause of Action, which alleges that the Defendants violated Sections 1 and 2 of the Sherman Act (15 U.S.C. §§1 and 2). Defendants argue that NCS has not pled an antitrust "injury" and, even if it has, the Defendants are immune from Sherman Act liability.

    An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977). Even an economic loss that can be linked to a per se violation of the Sherman Act is not compensable in the absence of antitrust injury. For example, in <u>Valley Products, Inc. v. Landmark</u>, 128 F.3d 398, 402 (6th Cir. 1997), Valley alleged that it was unlawfully excluded from competing in a hotel franchisor's market for logoed room amenities, after the franchisor cancelled all but two of its vendor contracts. The Sixth Circuit affirmed the dismissal of Valley's complaint because, even if the franchisor's conduct was anticompetitive, Valley's injury was actually caused by its contract cancellation, and not by the anticompetitive conduct.

    It is not at all clear that an ODJFS decision about appropriate local agency contracts and their eligibility for federal funds under a complex federal-state program is the sort of conduct to which the antitrust statutes are directed. But

even if the Sherman Act can reach this conduct, and assuming (for Rule 12 purposes) that NCS has adequately alleged an "antitrust injury," the Court finds that the Defendants are immune from antitrust liability under the state action doctrine first set forth in <u>Parker v. Brown</u>, 317 U.S. 341 (1943). There, the Supreme Court rejected an antitrust challenge to a state-created "cartel" of raisin producers, and held that "state action" is immune from a federal antitrust claim. NCS does not allege that ODJFS delegated any power or authority to any private party who was acting on behalf of the state. Thus the only question before the Court is whether the challenged action is "state action" entitled to immunity.

Unless the state actor is acting as a commercial participant in a defined market, and not acting as a regulator, "where the action [is] that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action." <u>City of Columbia v. Omni Outdoor Advertising</u>, 499 U.S. 365, 379 (1991) (internal citations and quotations omitted). In other words, state actors do not lose their antitrust immunity because they make a "wrong" decision, or misapply the law in reaching a particular decision. See, e.g., <u>Consolidated Television Cable Service, Inc. v. City of Frankfort</u>, 857 F.2d 354 (6th Cir. 1988).

Moreover, even if the conduct is not directly that of the legislature or a sovereign branch of state government, state action immunity will apply when the state actor is acting

pursuant to a "clearly articulated and affirmatively expressed state policy." See, Hoover v. Ronwin, 466 U.S. 558, 569 (1984). Anticompetitive conduct of a state administrative agency is immune, so long as it is a reasonable and foreseeable exercise of sovereign powers delegated to that state agency. Hybud Equipment Corporation v. City of Akron, 742 F.2d 949, 960-962 (6th Cir. 1984).

The Ohio Legislature mandates that ODJFS implement and oversee a complex child support system that complies with federal and state law. See R.C. 3125.03 et. seq. R.C. 3125.24 expressly requires ODJFS to supervise local CSEA's to ensure adequate performance and compliance with law. Federal and state law permit county CSEAs to contract with private entities when that is advantageous to the state or the local entity. See R.C. 3125.13. But nothing in federal or state law compels the use of private contracts. ODJFS actions and decisions with respect to the administration of the child support enforcement system, including decisions concerning private vendor contracts, are clearly "state action." As noted in McGuire v. Ameritech Services, 253 F.Supp.2d 988, 1010 (S.D. Ohio 2003): "The reality of government operations is that monopolistic control of services, whether procured by the government for its own use, or provided for third parties on behalf of the government, produces efficiencies. It would be pioneering indeed for a federal court to hold that Congress, in enacting the Sherman Act, intended to prohibit states from entering into exclusive service contracts

necessary and efficient to their own operations."

The Court sees nothing nefarious about ODJFS goal to maximize state and local agencies' recovery of federal funds for the Title IV-D program, as NCS suggests.  This goal, and conduct in furtherance of that goal, does not deprive the Defendants of immunity from Sherman Act claims.

The Third Cause of Action of the Second Amended Complaint, brought under the Sherman Act, is therefore dismissed with prejudice.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  Plaintiff's First and Second Causes of Action brought on behalf of "children and custodial parents" is dismissed without prejudice.  The motion to dismiss Plaintiff's First Cause of Action for violation of Plaintiff's procedural due process rights is denied without prejudice to renewal, and is granted with respect to NCS' substantive due process claim.  The Second Cause of Action for violation of NCS' rights under 42 U.S.C. §654 or §655 is dismissed with prejudice.  The Third Cause of Action for antitrust violations is dismissed with prejudice.  The motion to dismiss the Fourth, Fifth and Sixth Causes of Action (state contract claims) is denied without prejudice.  The motion to

dismiss the Seventh Cause of Action is granted, and that claim is dismissed with prejudice.

DATED: April 18, 2005            <u>s/Sandra S. Beckwith</u>
                                  Sandra S. Beckwith, Chief Judge
                                    United States District Court