```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

| | |
|---|---|
| National Child Support, Inc., | Case No. 1:02-cv-928 |
| Plaintiff, | Judge Sandra S. Beckwith |
| v. | |
| Thomas Hayes, Director, Ohio Department of Job and Family Services, et al, | |
| Defendants. | |

**ORDER**

Before the Court are the parties' cross motions for summary judgment.  Plaintiff's motion (Doc. 68) seeks summary judgment on its claims that Defendants breached and/or interfered with its contracts with certain Ohio county Child Support Enforcement Agencies.  Defendants' motion (Doc. 67) seeks entry of judgment on all of Plaintiff's claims, and dismissal of the individual defendants based on their qualified immunity. (Doc. 67)  The parties have each filed responses (Docs. 74 and 75) and replies (Docs. 77 and 78) to the respective motions.

The Court grants Defendants' motion.

**FACTUAL BACKGROUND**

National Child Support, Inc. ("NCS") is a private child support collection company.  Beginning in approximately 1995, NCS

entered into contracts with several Ohio county Child Support Enforcement Agencies, to perform investigation and collection services.  Several of these contracts are attached to the Stafford Affidavit, Defendants' Exhibits 13 through 27 (Doc. 70). These contracts are on standard forms and specify the services NCS provides, for which NCS was generally paid on a percentage fee basis.  Overall contract funding is described on the first page of the contracts as a combination of federal and nonfederal, or local, matching funds.  All contracts are expressly limited to one-year terms, although counties are able to solicit and accept three-year proposals, requiring a new contract to be approved every year.

Federal financial support for state child support services is authorized by Title IV-D of the Social Security Act, and administered by the Department of Health and Human Services. Federal matching funds are provided to participating states at a current rate of 66% of the state's eligible costs.  Ohio's participation in the federal cost-sharing program is administered by the Office of Child Support within the Ohio Department of Jobs and Family Services (formerly called the Ohio Department of Human Services).  Broadly speaking, county CSEAs submit their cost data to the state Child Support Office, who approves county expenditures and contracts for federal cost sharing, termed "federal financial participation" or FFP, in the applicable

regulations and contract forms.

In the latter part of the 1990's, apparently in anticipation of possible funding decreases, NCS proposed a "volume discount" contract to some of the CSEAs.  This is illustrated in a letter NCS wrote to the Sandusky County CSEA on February 26, 2001. The letter was responding to the County's announced intent not to renew its NCS contract because of anticipated funding shortfalls. This contract, as with the other NCS contracts from the late 1990's, required 34% of contract funding (the local share) to be paid by the county.  The letter describes NCS' new proposal: "That is why many of our clients hire NCS under our volume discount plan, where NCS waives CSEA's 34% county non-FFP portion by contractual agreement."  (See Doc. 70, Def. Exhibit 1.)

It is undisputed that ODJFS had approved several NCS contracts containing this "volume discount" fee arrangement. These include a Butler County contract for the period January 1, 2001 to December 31, 2001.  (Doc. 71, Exhibit 36.)  The ODJFS approval letter of February 16, 2001 states that the contract is substantially in compliance with applicable regulations, and is approved for federal financial participation.  (Doc. 70, Exhibit 8.)

Joseph Pilat became the Deputy Director of the ODJFS Office of Child Support in November 2001.  Prior to joining ODJFS in May 2001, Mr. Pilat was director of the Franklin County CSEA for

approximately ten years.  On December 4, 2001, Mr. Pilat sent a memo to all county CSEA directors.  Pilat states that his memo is written in response to questions from county CSEAs about the NCS "volume discount" contract, and ". . . a private contractor's ability to contribute the local share (34%) of contract costs when contracting with a CSEA.  The question is, in other words, whether a CSEA can agree to reimburse a contractor only the Federal share (66%) of contract costs."  (Doc. 70, Pilat Affidavit and Def. Exhibit 28.)

Pilat concluded that this contractual arrangement does <u>not</u> qualify for federal financial participation, citing 45 CFR §304.30 and pertinent sections of the Ohio Administrative Code then in effect.  These provisions, according to the memo, require counties to contribute the local share of Title IV-D expenditures from public funds, not from private funds.  Pilat announced that ODJFS would not approve any future CSEA requests for federal financial participation for contracts under which the vendor provides the local share, or accepts the federal participation share (66%) as full payment of contract costs.

This announcement led to predictable results.  Butler County CSEA's contract with NCS beginning in January 2000 had a total ceiling cost of $250,000, to be paid entirely with federal funds.  That ceiling was raised to $500,000 by amendment in September 2000.  And in January 2001, the contract was extended for another

year at the $500,000 ceiling, also paid entirely with federal funds. (Def. Exhibit 36) Each of these contracts was approved by the Butler County Commissioners, whose resolutions expressly state that the contract is "subject to the approval of the Ohio Department of Jobs and Family Services in accordance with current Title IV-D regulations." (Doc. 71, Butler Affidavit and Exhibits 34-36.)

In January 2002, after the Pilat memo announced the change in policy, Butler County extended its NCS contract for another year, but with a ceiling amount of only $25,000. Butler County's 34% local share of $8,500 was to come from CSEA's administrative fund, and not from any volume discount or contribution by NCS. (Def. Exhibit 37) And in 2003, Butler County approved an additional contract year with NCS, but with even lower funding, only $14,999. (Def. Exhibit 38)

Montgomery County CSEA had also become interested in the NCS "volume discount" arrangement, and the Montgomery County Board of Commissioners had formally approved an NCS contract with a face value of $900,000 on September 11, 2001. (Def. Exhibit 12) The Commissioners' Resolution expressly states that the contract is contingent upon the continued availability of funding. The contract was also approved by the Montgomery County prosecuting attorney's office, and was then forwarded to ODJFS for approval for federal funding. After the Pilat memo, the Board of

Commissioners rescinded the contract because, as stated in the rescission resolution, ODJFS has determined that "NCS services are not allowable under ODJFS guidelines." (Resolution #02-162, January 29, 2002, Def. Exhibit 12)

**PROCEDURAL HISTORY**

NCS filed its original complaint in this case in December 2002. The Second Amended Complaint, filed September 10, 2004, alleges several federal and state law claims on behalf of NCS and its clients, the parents and children on whose behalf NCS collects unpaid child support. (Doc. 23) The named Defendants are ODJFS, its then-Director Thomas Hayes, Joe Pilat, and Barbara Stafford, the director of the Office of Child Support Bureau of Policy. The individual defendants are sued in both their official and individual capacities.[1]

Defendants filed a motion to dismiss all of NCS' claims. (Doc. 24) The Court's April 18, 2005 Order (Doc. 32) dismissed the claims brought on behalf of NCS' clients, concluding that NCS lacked standing to prosecute those claims. The Court also dismissed NCS' antitrust claim, and all claims against ODJFS (and the individual official capacity claims) on Eleventh Amendment grounds. The Court denied the motion to dismiss the federal procedural due process claim and the state law contract claims

---

[1] Barbara Riley was substituted for Hayes under Fed. R. Civ. P. 25(d) on the official capacity claim when she became ODJFS Director on December 20, 2004.

against the individual defendants, because the question of the existence of a constitutionally protected property interest in the NCS contracts could not be resolved under Rule 12.  As a result, the Court could not determine if the individual defendants were entitled to qualified immunity.

Defendants then filed a motion for judgment on the pleadings (Doc. 41), arguing that the surviving federal due process claim should be dismissed because NCS failed to allege inadequate state remedies.  The Court denied Defendants' motion in its May 10, 2006 Order (Doc. 52), finding that the due process claim did not, on its face, require NCS to plead the inadequacy of state remedies under governing Sixth Circuit precedent.

The parties now bring their cross motions for summary judgment.

**ANALYSIS**

1.  <u>Summary Judgment Standards</u>.

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but

... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)). The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. den., Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether,

in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.  "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted).

2.  Procedural Due Process Claim.

A successful procedural due process claim under 42 U.S.C. §1983 requires NCS to show that Defendants acted under color of state law to deprive NCS of a definite, constitutionally-protected property interest.  Protected property rights are created by state law.  NCS must show some Ohio law under which Ohio conferred a contract right to support a legitimate claim to having its contracts approved by ODJFS.  "A cognizable property

interest arises when plaintiffs have a legitimate claim of entitlement (or more than a unilateral expectation) to a particular benefit." Paytel v. City of Detroit, 287 F.3d 527, 539 (6th Cir. 2002) (internal quotations and citations omitted).

NCS asserts that its contracts with the county CSEAs are protected property interests under the Ohio constitution, Article I, Section 1 and Article II, Section 28. Art. I §1 generally confirms the right to "life, liberty and property." Art. II §28 states: "The general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts; but may, by general laws, authorize courts to carry into effect, upon such terms as shall be just and equitable, the manifest intention of parties, and officers, by curing omissions, defects, and errors, in instruments and proceedings, arising out of their want of conformity with the laws of this state." NCS argues that ODJFS' unilateral decision to disapprove contractual arrangements that had previously been approved amounts to an unlawful impairment of the obligation of contracts between NCS and the county CSEAs.

Defendants counter that NCS had no protected property interest in its contracts. They note that no contract with any CSEA was cancelled retroactively when the Pilat memo was issued. And the Pilat memo clearly states that it only applied prospectively. Furthermore, the Butler and Montgomery County

contracts intended to start in 2002 were not legally binding because the county commissioners expressly approved the contracts contingent on state funding approval. Defendants also cite the facts that all CSEA contracts are limited to a one-year term; that either party could terminate a contract for any reason on 30 days notice; and that all contracts were conditioned upon federal funding approval. In such circumstances, Defendants argue, NCS had no vested property interest protected under 42 U.S.C. §1983.

Applying the test set forth in United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 34 (6th Cir. 1992), NCS can establish a protected property interest in its public contract bid award if it can demonstrate (1) it was awarded the contract and then deprived of it, or (2) that state law granted the governmental entity limited discretion in awarding the contract, which the entity abused. "Abuse of discretion" means unreasonable, arbitrary or unconscionable, without adequate determining principle. See Enertech Electrical, Inc. v. Mahoning County Comm'rs, 85 F.3d 257, 260 (6th Cir. 1996). While NCS is not technically a "disappointed bidder," this analysis is helpful even outside of a bid contest setting, as noted in Ferencz v. Hairston, 119 F.3d 1244, 1248-49 (6th Cir. 1997).

Defendants cannot reasonably dispute that, absent the ODJFS position on local funding contributions, NCS and Butler County would have proceeded with their 2002 contract at the higher

-11-

funding levels. The Declaration of Dan Cade, former Butler County CSEA Director, confirms this fact. Similarly, the Montgomery County contract had already been approved by the County, and there is nothing to suggest that it would have been rescinded if ODJFS had approved the contract for federal participation.

However, the Court concludes that NCS was not "awarded" the Butler or Montgomery County contract and then "deprived" of it within the first prong of the United of Omaha test. The contract approval by the county commissioners was expressly conditioned upon state approval for federal funding. There is some Ohio authority holding that an implied contractual term is incorporated in any contract that is subject to the state's exercise of its regulatory powers. See, e.g., Cincinnati Gas & Electric Co. v. Arnold, 55 Ohio App.2d 261 (1st Dist. App. 1978). It is clear that the contracts at issue here were expressly conditioned upon ODJFS approval for federal funding, which after all was to provide 100% of the money to pay for these contracts. Thus, NCS' claim is more appropriately analyzed under the second prong of United of Omaha, to determine if ODJFS abused its discretion in determining that the NCS contracts did not qualify for federal funding participation.

The Second Amended Complaint alleged that Pilat and the individual defendants acted arbitrarily and unfairly targeted

NCS, wanting to drive them out of the CSEA contract business. NCS alleged that other private contractors doing business directly with ODJFS were allowed to do what ODJFS prohibited the county CSEAs from doing, suggesting an unfair or arbitrary application of the federal regulations to NCS. See Second Amended Complaint, ¶¶ 23, 26, 28, 52, and 53. But NCS' motion and the record it presents fail to produce any evidence of these allegations. There is nothing before the Court suggesting or implying that ODJFS implemented this policy unevenly, or granted exceptions to other similarly-situated private contractors that were not granted to NCS, or that any fraud or favoritism was involved. There is no question that ODJFS is charged by Ohio statutes with reviewing Title IV-D contracts and approving them for federal funding. The only question, then, is whether ODJFS abused its discretion in making the legal determination that it has made.

NCS plainly believes that its contracts do not violate any federal funding rules, in particular 45 CFR §304.30. ODJFS has come to the opposite conclusion. Defendants assert that the prior approvals of NCS contracts, given before Messrs. Hayes and Pilat came to ODJFS, were a mistake. They argue that a governmental agency charged with implementing a complex federal-state statutory scheme cannot forever be held to its mistakes by a private party who may at one time have relied on mistaken

policy interpretations.

45 C.F.R. §304.30 was promulgated in 1975, and is titled "Public Sources of State's Share." It does not appear to have been substantively amended since 1975. It states:

> (A) Public funds, other than those derived from private resources, used by the IV-D agency for its child support enforcement program may be considered as the State's share in claiming Federal reimbursement where such funds are:
>
>> (1) Appropriated directly to the IV-D agency; or
>> (2) Funds of another public agency . . .
>
> (B) Public funds used by the IV-D agency for its child support enforcement program may not be considered as the State's share in claiming Federal reimbursement where such funds are: (1) Federal funds, unless authorized by Federal law to be used to match other Federal funds; (2) Used to match other Federal funds.

As originally published in the Federal Register (V. 41, No. 32), the stated purpose of this regulation was to ease procedural requirements on local public agencies, who previously had to formally transfer money from one agency to the local Title IV-D agency in order to obtain federal funding for child support enforcement programs.

This Court has reviewed this regulation and pertinent sections of the Ohio Administrative Code concerning this issue. See OAC §5101:1-31-71 (as it was effective in December 2001), incorporating 45 C.F.R. §304.30. While NCS points out that the stated purpose of the federal regulation was simply to ease fund transfer requirements for local Title IV-D agencies, the Court

notes it plainly distinguishes between "public" funds and "private" funds, suggesting that the two sources should be treated differently. Defendants also note that the "volume discount" contract essentially encouraged counties to overstate the true public cost of its Title IV-D services, and could encourage local agencies to enter into expensive contracts simply because federal money would pay 100% of the costs. The Court cannot find Defendants' conclusions to be unreasonable or unconscionable, such that it amounts to an abuse of discretion.

NCS argues that ODJFS amended its own regulations and policy manual in 2004 (and again in 2006), to explicitly state that private funds (e.g., funds received directly from a vendor) cannot be used to satisfy the local share. NCS argues these amendments were not required by any change in federal law, and are evidence of "bad faith" of the Defendants in interfering with NCS' contracts. The Court disagrees. If anything, the consistent ODJFS position since the December 2001 Pilat memorandum tends to confirm the fact that the decision is not arbitrary or capricious. The most recent version of the IV-D Service Contract (accessed at www.odjfs.org on 2/22/2007) references the revised OAC §5101:12-10-45.1(G)(2), effective February 16, 2006, which states that the non-federal share may not be contributed by the contractor, either in cash or in kind. There are doubtless myriad policy considerations underlying this

rule, which this Court will not attempt to second-guess. The Court has not found, and NCS does not cite, any unambiguous federal rule that would support a conclusion that ODJFS abused its discretion in reaching the decision it has reached.

NCS does cite 45 CFR §74.23, which addresses cost-sharing and in-kind services in federal HHS contracts. NCS argues this section makes plain that federal law does not **forbid** the use of a private vendor's funds to satisfy a CSEA's local share. But Defendants rightly note that this regulation does not apply to Title IV-D contracts, as is plainly stated in 45 CFR §304.10.

After careful review, this Court is simply unable to conclude that the ODJFS position on local funds contribution for Title IV-D contracts is unreasonable, arbitrary, or lacking adequate determining principle.

3. <u>Qualified Immunity.</u>

Even if the Court were to conclude that a triable issue exists concerning Defendants' exercise of their discretion to determine that the volume discount contracts do not qualify for federal funding, the Court must address whether the individual Defendants are nevertheless immune from this claim. If the facts show that a constitutional right may have been violated, the Court must determine whether that violation involved a clearly established right of which a reasonable public official would have known. The Court must then determine whether the official's

conduct was objectively unreasonable in light of that clearly established right.

Whether a constitutional right is "clearly established" is a question of law. "Clearly established" means a rule announced in binding precedent from a controlling court, or a body of persuasive authorities that clearly address the proper resolution of the dispute, leaving "no doubt in the mind of a reasonable officer" that his actions were unconstitutional. See Gean v. Hattaway, 330 F.3d 758, 767-768 (6th Cir. 2003). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 639-640 (1987).

NCS broadly asserts that "contract rights" are clearly established rights, and Defendants' decision caused their contracts to be cancelled or greatly reduced in value. This general assertion of "contract rights" does not aid the Court in analyzing the particularized "right" involved in this case - the "right" to contract with local CSEAs and obtain federal Title IV-D matching funds to pay the entire cost of that contract. As discussed above, the Court has not found any federal statute or regulation, much less any controlling case, that **requires** ODJFS to approve the "volume discount" contractual arrangement between NCS and the county CSEAs.

The Court concludes that no authority exists which would

-17-

have alerted Defendants that NCS had a constitutionally protected right, based on the statutes and regulations governing Title IV-D programs, to continue its "volume discount" contract arrangements with any county CSEA.  For that reason, the Court concludes that the individual Defendants are entitled to qualified immunity from NCS' due process claim.

4.   <u>State Law Claims</u>.

As the Court has granted summary judgment to the remaining individual Defendants on NCS' federal claim, the Court will dismiss without prejudice NCS' state law claims for breach of contract, inducement of contract breach, and tortious interference with contract.  The Court finds there would be no substantial savings in judicial resources from resolving those claims at this time, especially in view of the possibility that unsettled state law issues (such as whether equitable estoppel may apply to the state actors) may become relevant.  NCS does not point to any undue amount of duplicative effort that would be required, should it refile its state claims in state court.  See <u>Hankins v. The Gap, Inc.</u>, 84 F.3d 797, 803 (6th Cir. 1996).

## CONCLUSION

For all of the foregoing reasons, the Court grants Defendants' motion for summary judgment, because the individual Defendants are entitled to qualified immunity from the only remaining federal claim under 42 U.S.C. §1983, for violation of

-18-

Plaintiff's procedural due process rights.  The state law claims are dismissed without prejudice.

    SO ORDERED.

DATED: March 9, 2007　　　　　　　　　<u>s/Sandra S. Beckwith</u>
                                        Sandra S. Beckwith, Chief Judge
                                        United States District Court